Good morning, Your Honors. Thank you. May it please the Court, my name is Simon Jerome from the Department of Justice for the Federal Government. I'd like to reserve three minutes of my time for rebuttal, please. The Bank Secrecy Act was passed in Congress's recognition that addressing the problem of money laundering requires granting the government certain investigative tools. One of those tools, which is found at 31 U.S.C. 5326A, the statute at issue in this case, enables the Financial Crimes Enforcement Network, or FinCEN, to impose time-limited reporting requirements through an order where the Secretary deems such a step necessary to further the purposes of the act or prevent evasions thereof. The agency has used that authority on a broad basis several times in the past, just as it did here. I'll begin with the statutory authority piece, which was the lead of the District Court's rationale in entering a preliminary injunction. The text is clear that where the Secretary determines reasonable grounds exist for imposing additional record-keeping and reporting requirements, he may do so. Let me start with irreparable harm, please. I have some questions, if you don't mind. Yes, Your Honor. Okay, thank you. All right. If we go to the TRO hearing transcript, the Court said, I think plaintiffs have gone beyond any speculation and business has been impacted in some fashion. And the Government Counsel said, yes, agree. The Court said, okay. And the Government Counsel said, this business has been impacted, and that's why I really want to focus on the likelihood of success. And, you know, before that, the Attorney said, I did want to touch briefly on harm and point out that we have just one business and one plaintiff, and not to minimize the importance of one business in our country, but the harm that has been put before the Court is very specific to that type of business, to a small business, without automated software, not previously conducting transactions that would trigger the CTR requirement. So you would agree that at the TRO stage, the Government Counsel did concede there was harm to the plaintiff, correct? Certainly that there was harm, Your Honor. Okay. All right. And then let's go to the preliminary injunction hearing as well. The Court said, my recollection, and I haven't read the transcript, Ms. Parker, that was Government Counsel at the TRO hearing, of our TRO hearing, but my recollection was that you conceded to some extent the irreparable harm, so that now you're not. Am I correct? You smiled like a sort of, am I a little correct on that? And Ms. Parker said, correct. That you are not conceding it. The Court, no. That there was a concession to some extent about irreparable harm. And Ms. Parker, the Government Counsel says, there is harm here, Your Honor. There is harm here. Has it been exaggerated? Yes. Could there be more efforts to reduce it? Yes. There is evidence of harm in the record, Your Honor. Yes. You agree with that, correct? That there was a concession about irreparable harm from Government Counsel about the TRO and the PI hearing. I understood there to be a concession about harm, certainly, that harm had been shown. I do think when it comes to the Court's law within its equitable discretion to look at the irreparability of that harm, we do not contest that the District Court made a factual finding that there was irreparable harm with respect to this plaintiff. That's correct, Your Honor. I do think... And you agree that there's certainly case law that the threat of being driven out of business is sufficient to establish irreparable harm, correct? I agree that there is that case law. Yes, Your Honor. How do we address it here in this situation? The District Court at the PI stage, at that time, the GTO had a $200 threshold. Yes, Your Honor. And the analysis was based on that. Now that order expired, was renewed. Now it's at $1,000 threshold. So if we remanded, say, here assume for purposes of this question, if we remanded, what do we do with the irreparable harm analysis? So I think in terms of what this Court needs to decide or what would happen on remand? Yeah, what do we decide? We're in a kind of an odd situation here where the record, the District Court was based on $200 threshold. Now we know that's not in place anymore. Now it's at $1,000. What do we do with that? How do we review the irreparable harm analysis that's before us? So I think that you would look just at the evidence that the District Court had in front of it. I mean, isn't that totally moot? I mean, why are we deciding about $200 limit when that's not even the policy anymore? And that's fair. I mean, a preliminary injunction is prospective. Why do we even apply it? It doesn't seem to make any sense to address that because it's no longer a live issue. As Your Honor knows, I'll just back up for a second and I will answer your question more specifically, but the statute limits any GTO to six months. And so I think as a matter of common sense, it can't be the case that a GTO is issued, a universal or a very broad based injunction is entered, we appeal, and then this sort of thing repeats itself. I think that that sort of cries out. That's not to say that mootness yields always to common sense principles. I will say I think this appeal is not moot because the new, the reissued GTO does carve out of its scope explicitly businesses that are the beneficiaries of preliminary injunctions entered in district court litigation about the prior GTO. And so there is certainly an interest to the government in being able to enforce the new GTO against those businesses. I can't say that that will continue, that there will be further reissuances of that sort, but I do think that certainly the appeal remains live, the underlying case remains live, I think in a constitutional sense, which is a little different. And I think that the record of irreparable harm is the one that's before the court. As in, to put it a different way, if this court were to vacate the preliminary injunction, these businesses, including Novidad y Servicios, would be subject to the new GTO. And so I think that it's not, there's something that feels moot, I admit, with the expiration of the prior GTO, but I think these harm issues are still live. So the GTO that, I'm sorry, go ahead. Oh thank you. Counsel, let me ask you this. How does your irreparable harm analysis change if we look at the September versus the March GTO? So your honor, I think the March, excuse me, the September, the later GTO is not before this court, so I don't think that's in the record. I don't think that, in considering harm, I think the types of harms in, you know, in an equitable sense are similar to the government of not being able to enforce the GTO, a version of it, as it was analyzed by the district court, and also as it's, you know, the same government equities are at issue in being able to enforce the GTO moving forward. I think that, you know, I think as a plaintiff here to the plaintiffs, the individual business and its owner, would be different. I would wager a guess, but again, that's not in the record before the court, and so, you know, I think the court just has the record evidence that it does. So if we remand it, should we direct the district court to analyze the $1,000 limit? I think that would require an amendment of the pleadings, your honor, but I think that that would be, if you were to remand, I think it would be appropriate to the plaintiff's chance leave to amend and to proceed from there. So I just want to clarify, the September GTO is not before this court. That's correct. Right, the only thing that we have to review, the only record we have, the only underlying district court decision we had to review, is to the March $200 GTO, correct? That's correct, your honor. And the government's position is that the $200 March GTO, it's not moot because it's capable of repetition, and so we should analyze and rule on the district court's preliminary injunction as to the $200 GTO, correct? I agree with you with respect to the constitutional case or controversy aspect of mootness, as to the mootness of the appeal, if there were any. I think that is separate. I think that the appeal is not moot, again, because the new GTO carves out of its scope businesses that are beneficiaries of a preliminary. So it basically extends the preliminary injunction that the district court here entered? In effect, yes, your honor. Got it, thank you. Just to carry on while we're on the topic of the equities, I think I agree with your honor that there was a concession of harm that the district court found that that was irreparable. That does, as this court and the Supreme Court have said a number of times, the question of harms have to be, they merge in a consideration of the public interest when the government is the defendant, and I do think the district court got the balance wrong here. Again, this is an important law enforcement investigative tool. Being able, not unable to implement an order that was validly issued under the statutory authority throughout the entirety of the Southern District of California, the two California counties to which it applied, is an infringement on the government's ability to exercise that prerogative, and so that balance, I think, weighs differently. So if your argument in response to the irreparable harm finding of public interest, then it means, it sounds to me like you're conceding the irreparable harm finding was correct. I think, I think we're in a difficult position, your honor, to say I agree that the district court made a factual finding. I don't think that we are in a place, we have not argued that that was clear error, that that factual finding of irreparable harm was clear error. As I say, I mean, in an equitable sense, we've noted that there is the existence of software that can ameliorate these burdens. I do think the court is well within its rights to take that into consideration. Attempts to mitigate harm, it's one thing to say a business has suffered harm, it's another thing to say it could have done something more to prevent that harm and did not do so. These are things the court can and should consider, in particular as it balances those harms against harm to the government. But yes, your honor, I think there is certainly a, the concession you're describing is an accurate way to describe things. You know, I'd also like to look at the FinCEN memo, which is what the government is citing as a justification for this $200 GTO. And, you know, the district court, this is at the TRO hearing, you know, raised a lot of concerns that, you know, the date is March XX 2025, and the authorizations have FinCEN director, you know, basically MM for month, DD for date, YYYY for year, and then for principal deputy assistant attorney general counsel, whether it was cleared, says MM for month, DD for date, YYYY for year. There's all these redactions. I mean, I don't know, this top could say draft, draft, draft. We don't know. There's a lot of redactions on this document. And when the district court expressed some concerns, you know, there's also like red lines here. It's not even clear that this is final. There are red lines on this document. The conclusion is basically redacted. The analytic plan is completely redacted, completely redacted. So when the district court asked questions, you know, about this, this is what the government said, which gives me pause. You know, she says, I'm curious, was this ever put out? You know, this is the FinCEN document. It doesn't have a real date on it. It looks a little, doesn't look like it was ever put out. It has March XX. Ms. Parker, counsel for the government, says I don't know the answer to that question. And that, you know, gives me pause. Let's go to the preliminary injunction hearing so then the government had time to think about was this ever put out. And, you know, the court goes through, you know, a lot of concerns about the fact that, you know, there's no date. It's not, it doesn't indicate that the FinCEN director approved it or the principal deputy assistant general counsel cleared it. There's no dates on those. And, I mean, the district court kind of extensively, you know, that's bothered me throughout the case. Is there any evidence in the administrative record that predates the issuance of the GTO? There's an internal memo dated March XX and it never looks like it went out. It never, I mean, what's the date on any of this? You can't, after the fact, justify what's been done, ma'am. And why isn't there a date on the memo and in the administrative record basically was everything that that document references. It's March XX 2025. And Ms. Parker says, I have it, Your Honor. Debate's number in the administrative record. And the court says, you're a litigator, ma'am. And, you know, it doesn't look good, right? And Ms. Parker's answer is, I don't know what that XX means, Your Honor. I don't. We don't. The court says, so we have no idea when that was issued. It could be an after the fact rationalization and quick job to justify what was done. And Ms. Parker says, I don't have any information about that XX, Your Honor. So, I mean, there is the presumption of regularity and I don't have any evidence that it was created after the fact, but I don't know. I don't have any factual information about the reason for the XX. Your Honor, if I could, I'll just say, you know, plaintiffs do make quite a bit of the March XX aspect of the memo. In their briefing, there is at docket 18.1, page ID 210. This is not in the excerpts of record, but is in the record itself. There is a certification of the administrative record by a record specialist at the agency. In addition to records being presumptively valid, that I think conclusively resolves the validity. Plaintiffs do not attack the validity. But how can you have any regularity when the, I mean, the TRO hearing was April 22, 2025. The PI hearing was May 15, 2025. So the government had almost a month to figure out what's its story on this document. And they come back a month later and all they can keep saying is, I don't know. I don't know. I don't know. Why should that be given the presumption of regularity? So I don't think, Your Honor, I don't understand my colleague at the trial court to have been saying they don't know that this is valid. They don't know that this is sort of an accurate representation of what the agency considered. I think that's a distinct possibility at the TRO stage, given the pace at which things developed. But all of this to say, I think the administrative record that the agency had is the administrative record it has. And again, that's been certified as valid. I don't understand my friends to attack the validity in any formal sense or, you know, the reliability of the idea that this was what the agency had before it at the time it made the decision. And... Oh, the district court completely didn't agree with that. It actually made a finding that it wasn't, even though she went ahead and considered it. But I don't, I mean, I don't, I don't recall that. I mean, so to say that the other side wasn't raising that, I mean, that is just, I mean, I can quote Mr. Johnson. He, you know, he's saying, yes, we're really concerned. I mean, shouldn't the, this is maybe another issue for potential remand for the district court to make a factual finding about what this memo is. Because I think in the district court opinion, the district court raises some doubts, but just assumes it's valid and then says, well, even assuming it's valid, the analysis was too cursory. I mean, shouldn't this also be addressed by the district court? And, you know, perhaps, you know, D.H. Finstead, excuse me, will have to produce a witness and a declaration, whatever it is. Not just some lawyer saying, I don't know, or this is that, but have a witness who can testify or submit a declaration to that effect. Your Honor, I think in the ordinary APA course, I don't understand that to be what's done. I think if there's not specific reason to think that the certification is not valid, i.e. that it's not certifying that the agency did have this information, I will say, I mean, just on temporality. I mean, we'll have to look at what the certification says. I mean, does it just say it's an authentic document? I mean, the question is, is this something they considered? It's with the certified index to the administrative records. These are the materials on which the agency relied in making the decision. Again, I'm sort of hesitant to say it would be the appropriate step to have witness testimony in the district court. I do think that these, that these, that sort of, I don't want to say typos, but sort of, it's obviously not ideal to have a memo dated the way it was, but I don't know that that sort of establishes that the agency was not considering this information. But it doesn't even say it was cleared and approved by the director of FinCEN. It doesn't say it was cleared by the principal deputy assistant general counsel. Your Honor, I'm sorry. I see that I'm below three minutes, which was the time I wanted. Well, I have more questions for you. I'm happy to. So, please, please stay. Sure. Okay. So, you know, one of the distinctions or some of the multiple distinctions about rule versus order is specific individuals versus broad category of individuals yet to be identified. Particular set of disputed facts versus general facts. Resolving specific disputes versus policy issues. Whether it impacts the future. You have a GTO here that covers, what, about five counties in Texas and California with over a million people, right? And if I look at the FinCEN memo, it's just talking about Fentanyl. It's just general, you know, drug trafficking statements. It has nothing about specific individuals. It doesn't identify specific individuals. It doesn't identify a particular set of disputed facts. It doesn't resolve any specific disputes. So, tell me why, with all of the criteria that we're supposed to consider in rule versus order, why this isn't a rule. Sure. So, I think, to begin with, there is, I think it's important to sort of think about what the purpose of the authority, investigative authority is, which is to enable FinCEN to undertake investigations when it doesn't have information. So, I think that we have to begin with the understanding that there are going to be things that FinCEN doesn't know. I think departing from that place, there was a considerable measure of specificity in the region FinCEN was considering. It looked at the southwest border. It looked at a particular type of suspected money laundering, that is, a transnational criminal involvement in money laundering tied to the Fentanyl trade. It looked at counties, 30 counties. It just looked at the number of currency transaction reports filed in zip code relative to the population and whether that was high. And proximity to a border. And it said that the same thing applies to Arizona and New Mexico, but we're going to carve them out. And, Your Honor, I would add that there is a, in addition to the proportion of CTRs, there's also in that same segment, this is ER, I believe, 169 to 170, looking at proximity to a border and border crossing. Yes, this is not many factors, but this is sort of a... Which would also apply to Arizona and New Mexico, correct? They have proximity. They are on the border. They do, Your Honor. They do have border crossings, correct? They do, but I think including them would have... But they were carved out. They were carved out. They were. And I think that there are a lot of good reasons to do that. I mean, to say an agency is able to undertake a broader investigation doesn't mean it shouldn't have undertaken a narrower investigation. I think, in terms of, Your Honor mentioned the number of people who live in these counties. These are 30 zip codes within the seven counties of the thousands of zip codes there are in the United States. This was... Targeted for 1 million people who have not yet been identified, correct? But I think the businesses were not identified with specificity. That's right, Your Honor. But I do think that this point you're discussing, it gets on this idea of a needless formality, which is that the money services businesses, in general, are required to register with FinCEN. FinCEN could have looked up which money services businesses were registered in these counties and just sent individualized notice to them. And I don't think it can be the case that the exact same agency action is unlawful as a rule when it could have... There was sort of this one extra formal step the agency could have taken but did not take, and that invalidates it as a rule. I think that that's not sort of consistent with the right way to read the statute. I think also we cited helpful precedent from the Fifth Circuit and WH Hodges. In that case, there was an investigative order issued to all 38 marketing agencies in Louisiana, stockyard marketing agencies. So in terms of breadth, that was on a state level, quite broad, and yet still the Fifth Circuit had no trouble concluding that because the purpose of the order was investigative. But that was directed at 38 specific companies? Again, Your Honor, I think... That were already subject to an investigation of rates. That's right. But I think that this, the context that this order arose in was... It identified the 38 companies, correct? I believe that to be the case. But again, Your Honor, I think that to say that this measure was invalid as a rule simply because it did not, FinCEN did not take another ministerial step it could have taken is the wrong way to look at things. I believe it follows... I'm sorry, I really do want to be attentive to my time. Unless... No, thank you. Okay. Well, we'll give an extra two minutes for robotics. I know we asked a lot of questions. Okay. Thank you, Your Honor. Good morning, Your Honors. Robert Johnson from the Institute for Justice on behalf of the FLEs. I want to start, I think, by addressing the question of mootness, given the court's questions. And, you know, it seems to me the simplest way through... I think we have multiple reasons this issue, this case is not moot or this appeal. But I think the simplest one, the one that sort of makes the issues easiest for the court, is the ground that it's capable of repetition yet evading review, which is the ground that government puts forward in its reply. And in the reply brief, the government cites this case, excuse me, where do we go Berkeley? It's a 2022 case from this court that involved a preliminary injunction where the preliminary injunction had expired. But the issue was still not moot on appeal because it was capable of repetition yet evading review. In that case, the preliminary injunction on its own had a sort of natural effect of about six months, which is about the same as the natural effect of a GTO. If I can interrupt, I agree with you in terms of APA issues, you know, which you should address. But again, my question is, what do we do with the irreparable harm analysis? The district court analyzed it based on $200. That's not an effect. Now it's $1,000. I mean, just as a practical matter, it seems like the proper thing to do is, or at least the most pragmatic, efficient thing to do is tell the district court, look at $1,000. Is there a repairable harm? So I think that makes sense if the court was viewing this through the lens of the case, the appeal is not moot because this PI still applies to the new order, which I think is the reason it's not moot. But under the capable of repetition yet evading review, this case would not be moot even if there was no new order. So I think the change in the order, in some sense, the court doesn't need to think about that because the court can just view this under the capable of repetition yet evading review lens. I mean, with the repairable harm analysis, we have to look at it and the $200, it's just, at least that aspect of it seems kind of a fruitless exercise. Well, and so I think maybe one way to clarify this a little bit is the new order expires on March 6th, 2026. So if the court was to do that and say, okay, let's send this back, let's do a new preliminary injunction hearing as to the new order, then say the preliminary injunction is entered again, then there's another appeal. Then say in March, the government decides, hey, actually, we really liked that $200 threshold. So we're going to go back to the $200 threshold. Now we have a new appeal that is going to raise that same question. Or say they decide, okay, in March, we're going to change it to $3,000. Well, now again, we kind of have that same issue. And the underlying sort of question of likelihood of success is just continually evading review, which is why I think the, again, the capable of repetition, evading review sort of way of thinking about this, it helps the court to avoid that. Because instead of having to sort of bounce up and down like a ping pong ball like that, the court can just say, okay, this is going to be-  Go ahead, Judge Alma. Oh, thank you. Counsel, would you agree, though, that the irreparable harm analysis would change if the amounts change? So $200 may be a lot more harmful than $3,000 minimum threshold. So I don't understand how that would stop the ping pong. So let's say the next order, March 7th, is $3,000, but the order after that is $100. Would you not be back before us? Well, exactly. And I think that's what I'm saying is that that's why the court, can just analyze this as it was before the district court at the time the order was entered, rather than trying to catch up to events as they are evolving below. And I hope that makes sense. It does, but I guess what I'm asking is, I don't know that this solves any kind of big issue for us. Because if we analyze it under the $200 threshold, but then they come back in March 7th with a $300 threshold, you're going to be right back, I assume. Well, yes. So I think that maybe brings me to my second point, which is that the government has never argued that the PI should be lifted because of the change in threshold. So I think, to the extent this is an argument that the government could have made, they never made it. They waived it. To the complete opposite, rather, they never, when they issued this new order, the order itself says in the terms of the order that it doesn't apply to businesses that are subject to this preliminary injunction. So it seems that the agency looked at this and said the appropriate thing to do from the agency's perspective is to apply the PI going forward to the new order, notwithstanding the change in threshold. So not only has the agency not raised that argument, it seems to me they have affirmatively foresworn it at the agency level. So I think it would be for the agency to then- It sounds like both sides are saying a ruling from this court would be helpful in guiding them going forward with whatever any new transaction reporting GTO would be. That's certainly my impression. That's certainly what we're saying. That's my impression. Right. And the government, in its briefing and now, is saying this is not moot. What's at issue is the $200 GTO and we'd like a ruling. And it's a carve out from the current GTO, so it's still a issue because the carve out preserves Judge San Martino's preliminary injunction. What section number is there for the carve out in the new, I guess I should say the September GTO? I believe it's in the definition of covered businesses, Your Honor. Okay. Thank you. If we can go back to the $200 GTO threshold limit and district court's analysis of it. Is there anything in the record that shows the plaintiffs, their company's revenues? I don't believe that's in the record. I mean, is there anything in the record about their profit level? I believe that is in the record, Your Honor, that these are all low margin businesses. But is there their profitability as a whole, as a business? No, I don't believe that's in the record. I mean, is there anything in the record about what the cost of compliance would be, actual numbers? Um, so again, I think that to the extent the court's question is, are these, is this in the record at the level of the business? Then no, I don't think this is in the record. What is in the record is that these are low margin businesses, that they are, that this is going to add an immense amount of cost, that these are small businesses with very few employees, and that it's simply, I think that certainly the conclusion is in the record that this is not a sustainable burden. But I mean, we, I mean, a preliminary injunction is an extraordinary remedy, and I know there are declarations saying we'll be put out of business, but, you know, we also say monetary harm itself generally isn't, doesn't necessitate a preliminary injunction. So it seems like district courts should at least analyze some of the numbers and say, okay, the profit level is this amount, the revenue is this amount. It doesn't have to be the most detailed analysis, but something like that. It seems like the district court just accepted the declaration statement that this will put out, put us out of business. And I guess, you know, think of it as hypothetical. Suppose there's a, California passes another minimum wage law, and suppose it's challenged and we'll just, I know some folks at IJ will like a return to Lochner. So suppose, you know, courts say there's a suspect where they have the authority and they seek a preliminary injunction, and a small business just issues, sends a declaration saying this will put us out of restaurants here. We're in a low margin business. I can't imagine a district court ever just accepting face value. This will put us out of business without saying, okay, well, let's look at some of the numbers to satisfy the court that it is truly a repairable harm. And I just don't see that here. So, you know, I would take issue with one thing that your honor said, which is the economic harm is not irreparable harm typically, you know, in the context where the government is being sued. Monetary harms are not recoverable because of sovereign immunity. And so actually what the case is. That's a fair point. On the other hand, there's also, you know, analysis would be, can you raise your prices to, you know, to hire somebody who will handle these things. Again, these are things, it seems like district courts should have analyzed before issuing a preliminary injunction. I'm sorry, but I thought I read specifically that there was an answer to this, that using the 28, 29 minutes per transaction that FinCEN says it would take somebody without automatic software to do. And then she estimated the number of transactions she does per day, which I thought was about 1500 to what? 2500? That she calculated she would need someone to do this between 15 and 17 hours a day so that she would have to hire a new person and the salary would be roughly $70,000. And then I thought she also had in this, and unfortunately I don't have it in front of me, but I recall reading it, she also said that some of these workers are actually done by commission. And so the cost of hiring somebody for $70,000 a year for this business and then having to pay them commission, that was what was going to threaten the existence of the business. And that there's ample evidence that, you know, in Texas where it was in effect, business has gone down 50, 60%. And then she also said, I'm sorry if I knew I'd need to have this at my fingertips, but she also said during the brief time that this was in effect before the injunction as well, that her business went down, what, 35% in the first week? And I'm sorry, let me see. Approximately 50 to 60% of the customers I've explained the requirement to have left the store without completing a transaction. So that Novadatus declared that it lost around 50 to 60% of its customers within the first week the GTO was in effect. So I think there was more in the than just, oh, I'm going to go out of business. I mean, you know, the Texas example as well has similar that 50 to 60% of the customers during the time the GTO was in effect. Oh, I'm sorry. It's a similar business in San Diego, also lost 50 to 60% of customers during the time the GTO was in effect. And that's the El Frijolito money service business. And saying that in addition to filling out the paperwork, just taking the time to get the information from the customers was taking 20 minutes per transaction on top of what it takes to actually fill out all the paperwork. And so, yeah, and this one is saying that most employees range in salary from 18 to $24 an hour, some earn commissions. So if they can only do three money transfers per hour, they're at best breaking even with the lowest salary employee, but for the employees making $18 an hour making a commission, they're losing money on each transaction. I appreciate all of that, Your Honor. And I thank you for, and I, you know, honestly, look, when I, I may have undersold it a little bit, but I was, I think the question I was answering was, you know, is there a top line, exactly how much is this going to cost? But yes, I mean, there's a wealth of detail in the record. I mean, going out of business is a, it's not just, you know, every government regulation will impose costs. If we use that standard, you know, preliminary injunctions would be ubiquitous. Government regulates business all the time. They all impose costs. And, you know, a lot of them will say this will make my business more difficult, but to say it's going to put us out of business, I think seems to be a higher threshold. You know, can you increase costs? You know, again, every time a minimum wage is increased, you always hear complaints of it's going to put us out of business. Some might, but a lot of them, they don't. They increase their prices. They innovate. They do things. I would point the court, the court to Washington versus Trump, which is cited in the brief. This court just last year said that economic harms are typically irreparable when you're, when you are litigating against the government because of the issue that you can't recover given sovereign immunity. You know, obviously the state of Washington wasn't going to be put out of business by whatever harms that were at issue in that case, but the court said that those were irreparable harms. You know, I think that these, I think the record is clear that the district court did not abuse her discretion in finding that these businesses did face a very real profound risk of being put out of business. I think that's very clear from the record that we're talking about, this is a one person, essentially a one person business. You know, given the amount of time it takes to fill out all of these forms at 25 minutes per form, or if you look at the form itself, it says 40 minutes per form at the bottom of the form. The government doesn't disagree with that, with, you know, that this is a form that takes a huge amount of time to fill out. That's expensive. You have to hire people. You have to take all kinds of steps to do that. It's just not sustainable. So I don't think that was an abuse of discretion, but even if it was, you don't have to be put out of business for it's of harm to be irreparable. So I think, you know, the record here, it just does not rise to the type of abuse of discretion. So this GTO was in effect in Texas, and there are declarations that they lost a 35% drop in customer volume as a result of the GTO being in place, and both Judge Bieri in San Antonio and Judge Scheidlauer in El Paso entered a temporary restraining order by Judge Scheidlauer, but a preliminary injunction by Judge Bieri for the exact same $200 GTO. Correct? Yes, absolutely. Every judge, there have been three judges that have looked at this. There's also the Voluta case in the Western District of Texas. Three judges have looked at this and found irreparable harm. You know, the other thing I would point out is that violations, you know, even a negligent mistake filling out of one of these forms subjects a person to penalties of thousands of dollars per form, and we're talking about businesses that have never had to submit this form at all because they don't do transactions over $10,000. Suddenly having to do, you know, dozens a day, thousands a year, is an enormous liability that is suddenly being imposed on these businesses, that if they make a mistake filling out the form, that can impose civil liability and even criminal liability. You know, I just want to clarify, Judge Scheidlauer in El Paso issued both a temporary restraining order and a preliminary injunction order on the $200 GTO. Correct. So you have three different district judges that have found irreparable harm. Right. Based on this loss of customers, because they can just go five minutes away to a business that is not subject to these regulations and requirements, correct? Well, exactly, and so I think that's the other aspect of irreparable harm here is that, you know, customers can simply move, and if they do move, they may never come back. And there's also the issue of reputational harm, that, you know, why is this business asking me for this information when, you know, it's in the record that there's another business five minutes from our client's store, where the customers could simply go five minutes down the road, now they're outside of the covered zip codes, and they wouldn't have to provide this information. Customers are going to say, well, why is, you know, this store asking for all this information, this other one five minutes away is not, you know, that I think is a reputational harm as well. Is there any evidence in the record that Ms. Novodatos or any of these, I guess that's her company name, excuse me, could just raise their prices? You know, actually, so I think that that's addressed, interestingly, the government in the March memo, the one thing they say about costs is that, and the government has recited this repeatedly, is the agency says, well, they're still subject to competition from banks, so we don't think that they're going to raise their costs. Which, you know, I don't think is an adequate analysis of costs in terms of the arbitrary and capriciousness issues, it doesn't say that, what about all those burdens that are being imposed, but certainly the agency looked at that and said, no, they're not going to raise their costs, because they still face competition from banks. That may be the only thing in the memo that I think is accurate, but I do think that's true. You know, you have banks, you also have that you have to compete against, there's also, again, there's a business five minutes down the road that's not subject to this. So if Ms. Gomez was to raise her prices, customers would just go down the road, so I don't think that that's an option to raise prices. Why don't you address, you know, just getting some kind of software? Yes, so I think, you know, I would say that definitely is, it's in the record that Judge Sammartino was aware of that, she considered it. I'd point the court to ER 9, in the opinion, where Judge Sammartino addressed that issue. And, you know, there's a few issues with software. One is that it's expensive, so it's just simply another cost for the business, it takes time to ramp up. It's not something that can be done right away. It also doesn't eliminate the burden. So, you know, the FinCEN has a Paperwork Production Act release where they estimate how long it takes to fill out CTR forms, and what they estimate is 23 minutes for small businesses. But they said for more sophisticated, larger businesses, they still estimated eight minutes per form. So if you're talking a burden of, you know, it's going to make the burden smaller, but it's still, we're talking hours per day of added paperwork for a small business, which is, you know, if you're trying to run a one location small business with, you know, one person working at a time and you have to do hours of paperwork, this is just a very significant burden. And then it's also just hard to implement. So we're not talking about, you know, sophisticated businesses. This is, these are software processes that are being used by large companies that are filing many reports. Essentially, we're talking about this one location small business going from filing a volume of reports that is zero reports per year to a volume of reports that looks something like a mid-sized bank might be filing. But she doesn't have the resources or the sophistication of a bank to implement these kinds of software systems. So, you know, for instance, there's a... I thought there was something in the record that the software is actually built for banks and not for these mom and pop. What implication would that have? Right. So the software may not even be, you know, sort of tailored to their workflows in terms of how are they, what types of transactions are they doing? What types of, you know, information are they taking from customers? You know, banks have customer relationships. So they're building customer profiles. They have all kinds of other know-your-customer type obligations that don't apply to money service businesses. So yeah, it's just, it's a different tool for a different type of business. Again, I think it's an abusive discretion standard. And to look at this where there's evidence in the record, Judge Sammartino looked at that evidence. She talks about it in her opinion. And to say that she abused her discretion would, I think, be beyond a reach. I see that I'm out of time. Thank you. Thank you again, Your Honors. In the interest of confining my rebuttal to the scope of what my friend presented, I'll make three quick points, if I could. One initial point is about the mootness question. I understood my friend to say that we agree that the PIs that were entered in the various district courts apply of their own force to the new order. We disputed that point in the 28J letter response that we filed. And we continue to dispute that. I think it is mostly an academic distinction for purposes of this case. Because again, as Judge Koh noted earlier, that the new order does carve out of its scope beneficiaries of the prior preliminary injunction. But just to hold the line on that principle, I'd say that we disagree that former PIs that, by their terms, refer to particular agency actions, apply of their own force to new agency actions. Secondly, there were a number of questions about cost and burden. My friend cited Washington versus Trump. I would just say, in the vein of that line of questioning, I would be hesitant to say that any time a regulation, that the court should be cautious about reading its own precedent, saying that certain economic injuries are irreparable to apply to any business that's regulated ever. I think one takeaway that's plain is that burdens vary among the regulated businesses quite tremendously. It's a matter of mutual agreement that Walmart is a money service business. And I think we can all agree their ability to cope with incidental regulation far exceeds other businesses. And finally, on the question of burden, this court's case law is in line with the Supreme Court's case law on arbitrary and capricious review, which is that the agency abuses its discretion when it completely fails to consider an important aspect of the problem. Here, we do have a consideration of cost and burden, albeit short, at ER 170. I think that that carries the agency's burden. For those reasons, we would ask that this court vacate the preliminary injunction. Great. Thank you both for a very helpful argument. The case is submitted. And we'll actually take a five-minute break before we hear the third and final case. All rise. This court stands in recess for five minutes.
judges: LEE, KOH, ALBA